Citation Nr: 1331563 
Decision Date: 09/30/13 Archive Date: 10/02/13

DOCKET NO. 05-39 008 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in Waco, Texas


THE ISSUES

1. Entitlement to service connection for a heart disorder to include atherosclerotic heart disease, arteriosclerosis, coronary artery disease, heart implant, and heart murmur to include as due to an undiagnosed illness. 

2. Entitlement to service connection for memory loss and sleep problems, to include as due to an undiagnosed illness. 

3. Entitlement to service connection for bilateral hip disability to include as due to an undiagnosed illness. 

4. Entitlement to service connection for headaches, to include as due to an undiagnosed illness. 

5. Entitlement to an initial rating greater than 10 percent for gastritis. 




REPRESENTATION

Veteran represented by: Disabled American Veterans


ATTORNEY FOR THE BOARD

C.L. Krasinski, Counsel


INTRODUCTION

The Veteran had active service from April 1979 to July 1992. He was awarded a Southwest Asia Service Medal and served in Southwest Asia from August 1991 to November 1991. 

These matters come before the Board of Veterans' Appeals (Board) from two rating decisions of the Department of Veterans Affairs (VA) Regional Office (RO) in Waco, Texas. A September 2004 decision granted service connection for erosive gastritis with ulceration and bleeding and assigned a 10 percent initial rating, and denied service connection for heart implant. An August 2009 decision denied service connection for memory loss and sleep problems, deterioration of the bilateral hips, headaches, and hypertensive vascular disease due to environmental hazards in the Gulf War. 

In June 2011 the Board denied the claims. In May 2012 the U.S. Court of Appeals for Veterans Claims (Court) vacated and remanded the June 2011 Board decision based on a Joint Motion for Remand (JMR). In January 2013, the Board remanded this matter to the RO via the Appeals Management Center (AMC), in Washington, DC. The Board asked that the RO/AMC obtain VA treatment records and provide the Veteran VA examinations to obtain medical evidence as to the nature and etiology of the claimed disabilities and to obtain medical evidence as to the severity of the service-connected gastritis. The RO/AMC provided VA examinations in March and April 2013 and obtained a medical opinion in June 2013. As the requested development has been completed to the extent possible, no further action to ensure compliance with the remand directives is required. See Dyment v. West, 13 Vet. App. 141, 146-47 (1999) (remand not required under Stegall v. West, 11 Vet. App. 268 (1998), where the Board's remand instructions were substantially complied with), aff'd, Dyment v. Principi, 287 F.3d 1377 (Fed. Cir. 2002).

In evaluating this case, the Board has not only reviewed the Veteran's physical claims file, but has also reviewed the Veteran's file on the "Virtual VA" system to ensure a complete assessment of the evidence. 

Of note, the Veteran filed claims for service connection for hypertension, depression, and alcoholism, all on a basis of other than as part of an undiagnosed illness. The RO denied those claims in January 2006 (hypertension) and December 2008 (depression and alcoholism), the Veteran did not appeal those decisions and those issues are not before the Board. 

The Board is aware that the RO characterized the Veteran's claim for service connection for an undiagnosed illness as to include hypertensive vascular disease. However, this is not what the Veteran claimed. Rather, he specifically stated that he sought service connection for clogged arteries of the heart. He has been diagnosed with both essential hypertension and arteriosclerotic heart disease and has undergone angioplasty and stent placement in treatment of his disease of the left anterior descending artery. He has previously distinguished his vascular hypertension from his heart disease. Therefore, the Board finds that the issue, as characterized on the title page, accurately reflects the Veteran's claim for service connection for a heart disorder. If he wishes to file a claim with the RO to reopen the claim for hypertension he may do so. 


FINDINGS OF FACT

1. The Veteran served in the Southwest Asia theater of operations during the Persian Gulf War.

2. A qualifying chronic disability manifested by cardiovascular symptoms did not manifest during service in Southwest Asia or to a compensable degree for any six-month period since service. 

3. No cardiovascular injury or disease or chronic symptoms of a heart disorder were manifested during service. 

4. The Veteran did not continuously manifest symptoms of a heart disorder in the years after service. 

5. A heart disorder to include atherosclerosis and coronary artery disease did not have onset during the Veteran's active service, did not manifest within one year of separation from active service, and is not etiologically related to his active service. 

6. A heart murmur is not a disability or disease for VA purposes. 

7. The Veteran did not undergo a heart implant. 

8. A qualifying chronic disability manifested by memory loss and sleep impairment did not manifest during service in Southwest Asia or to a compensable degree for any six-month period since service. 

9. The Veteran did not manifest recurrent symptoms of memory loss or sleep impairment in active service. 

10. The memory loss and sleep impairment symptoms are attributed to an anxiety disorder, depression, and alcohol abuse and are not due to an in-service event, are not related to active service, and are not due to or aggravated by a service-connected disability. 

11. The Veteran did not manifest recurrent symptoms of left or right hip disabilities in active service or after service separation. 

12. Avascular necrosis of the left and right hips was not caused by any in-service event and is not related to active service. 

13. A qualifying chronic disability manifested by right and left hip avascular necrosis and hip pain did not onset during service in Southwest Asia or to a compensable degree for any six-month period since service. 

14. Avascular necrosis of the hips did not onset during the Veteran's active service, did not manifest within one year of separation from active service, and is not etiologically related to active service. 

15. The Veteran did not manifest recurrent symptoms of headaches in active service or after service separation. 

16. Chronic tension headaches did not have its onset during the Veteran's active service, chronic tension headaches did not manifest within one year of separation from active service, and chronic tension headaches are not etiologically related to active service. 

17. A qualifying chronic disability manifested by headaches did not manifest during service in Southwest Asia or to a compensable degree for any six-month period since service. 

18. For the entire period of the appeal, the service-connected gastritis more closely approximates moderate disability with recurring episodes of symptoms of abdominal pain more than twice a year and continuous moderate manifestations. 

19. For the entire period of the appeal, the service-connected gastritis does not more closely approximate moderately-severe or severe disability and is not manifested by impairment in health, anemia, weight loss, incapacitating episodes lasting 10 days or more in duration at least four times a year, vomiting, hematemesis, melena, small nodular lesions, multiple small eroded or ulcerated areas, severe hemorrhages, or large ulcerated or eroded areas. 

CONCLUSIONS OF LAW

1. The criteria for service connection for a heart disorder to include artherosclerosis, arteriosclerosis, coronary artery disease, heart implant, and heart murmur to include as due to a qualifying chronic disability, have not been met. 38 U.S.C.A. §§ 1110, 1117, 1131, 5103, 5103A, 5107 (West 2002 & Supp. 2012); 38 C.F.R. §§ 3.102, 3.159, 3.303, 3.307, 3.309, 3.317 (2013).

2. The criteria for service connection for memory loss and sleep impairment to include as due to a qualifying chronic disability, have not been met. 38 U.S.C.A. §§ 1110, 1117, 1131, 5103, 5103A, 5107 (West 2002 & Supp. 2012); 38 C.F.R. §§ 3.102, 3.159, 3.303, 3.307, 3.309, 3.317 (2013). 

3. The criteria for service connection for a right hip disability to include avascular necrosis, to include as due to a qualifying chronic disability, have not been met. 38 U.S.C.A. §§ 1110, 1117, 1131, 5103, 5103A, 5107 (West 2002 & Supp. 2012); 38 C.F.R. §§ 3.102, 3.159, 3.303, 3.307, 3.309, 3.317 (2013). 

4. The criteria for service connection for a left hip disability to include avascular necrosis, to include as due to a qualifying chronic disability, have not been met. 38 U.S.C.A. §§ 1110, 1117, 1131, 5103, 5103A, 5107 (West 2002 & Supp. 2012); 38 C.F.R. §§ 3.102, 3.159, 3.303, 3.307, 3.309, 3.317 (2013). 

5. The criteria for service connection for headaches to include as due to a qualifying chronic disability, have not been met. 38 U.S.C.A. §§ 1110, 1117, 1131, 5103, 5103A, 5107 (West 2002 & Supp. 2012); 38 C.F.R. §§ 3.102, 3.159, 3.303, 3.307, 3.309, 3.317 (2013). 

6. For the entire appeal period, the criteria for an initial 20 percent disability rating for gastritis with ulceration and bleeding have been met. 38 U.S.C.A. §§ 1155, 5107 (West 2002); 38 C.F.R. §§ 4.1, 4.2, 4.3, 4.7, 4.10, 4.21, 4.114 Diagnostic Codes 7304, 7307 (2013).


REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

1. Duties to Notify and Assist

The Veterans Claims Assistance Act of 2000 (VCAA) and implementing regulations imposes obligations on VA to provide claimants with notice and assistance. 38 U.S.C.A. §§ 5102, 5103, 5103A, 5107, 5126 (West 2002 & Supp. 2012); 38 C.F.R. §§ 3.102, 3.156(a), 3.159, 3.326(a) (2013). When VA receives a complete or substantially complete application for benefits, it is required to notify the claimant and the representative, if any, of any information and medical or lay evidence that is necessary to substantiate the claim. 38 U.S.C.A. § 5103(a); 38 C.F.R. § 3.159(b). VA must (1) inform the claimant about the information and evidence not of record that is necessary to substantiate the claim; (2) inform the claimant about the information and evidence that VA will seek to provide; and (3) inform the claimant about the information and evidence the claimant is expected to provide.

Here, the VCAA duty to notify was satisfied by way of a letters sent to the Veteran in June 2004, October 2005, March 2006, May 2008, February 2009, June 2009, November 2012, and February 2013. The June 2004 letter addressed the claims for service connection for heart disease, ulcers, and hemorrhoids, although it did not provide notice with regard to assignment of effective dates and disability ratings. The October 2005 letter provided additional notice with regard to the claim for service connection for a heart condition. The May 2008 letter provided adequate notice with regard to disability ratings for gastritis and hemorrhoids. The February 2009 letter provided adequate notice with regard to the claims for service connection for headaches, memory loss, sleep problems, and clogged arteries, due to service in the Gulf War and on a direct basis and included notice with regard to disability ratings and effective dates. The June 2009 letter provided adequate notice with regard to the claim for service connection for deterioration of the Veteran's hips. In these letters, VA informed the Veteran of the evidence and information needed to substantiate a claim for service connection and increased rating, and informed the Veteran of which information and evidence he was to provide to VA and which information and evidence VA would attempt to obtain on his behalf. VA informed the Veteran it had to obtain any records held by any federal agency. These letters also informed the Veteran that on his behalf VA would make reasonable efforts to obtain records that were not held by a federal agency, such as records from private doctors and hospitals. Finally, the letters told the Veteran that he could obtain private records himself and submit them to VA.

The Court held that the VCAA notice must include notice that a disability rating and an effective date of the award of benefits will be assigned if service connection was awarded. Dingess/Hartman v. Nicholson, 19 Vet. App. 473 (2006). The Court held that the VCAA notice must include notice that a disability rating and an effective date of the award of benefits will be assigned if service connection was awarded. Dingess/Hartman v. Nicholson, 19 Vet. App. 473 (2006). In the present appeal, the March 2006, May 2008, and February 2009 letters explained the type of evidence necessary to establish a disability rating and effective date for the claims on appeal. The claims were readjudicated in the November 2009 and February 2010 Statements of the Case and in the June 2010 and June 2013 Supplemental Statements of the Case, thus curing any lack of timeliness of notice. Prickett v. Nicholson, 20 Vet. App. 370, 376 (2006). As there is no indication that the Veteran has been prejudiced by any of the aforementioned notice defects, the Board does not find it necessary to remand the case to the RO for additional notice. See generally Shinseki v. Sanders 129 S.Ct. 1696 (2009); see also 38 C.F.R. § 19.9 (2013). 

VA has a duty to assist the Veteran in the development of the claim. This duty includes assisting the Veteran in the procurement of service and other pertinent treatment records and providing an examination when necessary. 38 U.S.C.A. § 5103A; 38 C.F.R. § 3.159. 

The Board finds that all necessary development has been accomplished, and therefore appellate review may proceed without prejudice to the Veteran. See Bernard v. Brown, 4 Vet. App. 384 (1993). The RO has obtained service treatment records and VA treatment records dated from 2004 to 2013. Moreover, all treatment records for which the Veteran has requested assistance in obtaining have been obtained and associated with the claims file. 

VA afforded the Veteran adequate examinations in August 2004 (gastritis and hemorrhoids), March 2006 (gastritis and hemorrhoids), September 2008 (gastritis and hemorrhoids), April 2013 (Gulf War claim, hips, heart, headaches, stomach). A medical opinion was obtained in June 2013 as to whether the bilateral hip disability was related to service. The 2013 VA examinations and medical opinions are adequate because the examinations were performed by medical professionals based on review of claims file and a solicitation of history and symptomatology from the Veteran, and an examination of the Veteran. Barr v. Nicholson, 21 Vet. App. 303, 312 (2007); see also Nieves-Rodriguez v. Peake, 22 Vet. App. 295 (2008). The VA examiners considered the Veteran's Gulf War service and provided medical opinions as to whether the claimed disabilities were related to this service. The VA examiner provided a medical opinion as to whether there was any evidence that the Veteran had a qualifying chronic disability. The VA examiners cited the evidence that supported the opinion. Neither the Veteran, nor his representative, has challenged the adequacy of the 2013 examinations obtained for these issues. Sickels v. Shinseki, 643 F.3d 1362 (Fed. Cir. 2011) (holding that the Board is entitled to presume the competence of a VA examiner and the adequacy of his opinion). Accordingly, the Board finds that VA's duty to assist with respect to obtaining a VA examination or opinion has been met. 38 C.F.R. § 3.159(c)(4). 

For these reasons, the Board finds that the duties to notify and assist the Veteran have been met, so that no further notice or assistance to the Veteran is required to fulfill VA's duty to assist in the development of the claims. Smith v. Gober, 14 Vet. App. 227 (2000), aff'd 281 F.3d 1384 (Fed. Cir. 2002); Dela Cruz v. Principi, 15 Vet. App. 143 (2001). The Board finds that no reasonable possibility exists that any other assistance would aid in substantiating the claims and VA met its duty to assist the Veteran. 

II. Service Connection

Laws and Regulations

Service connection will be granted for disability resulting from a disease or injury incurred in or aggravated by military service. 38 U.S.C.A. §§ 1110, 1131; 38 C.F.R. § 3.303. Service connection may also be granted for a disease first diagnosed after discharge when all of the evidence, including that pertinent to service, establishes that the disease was incurred in service. 38 C.F.R. § 3.303(d). Service connection requires competent evidence showing, (1) the existence of a present disability; (2) in-service incurrence or aggravation of a disease or injury; and (3) a causal relationship between the present disability and the disease or injury incurred or aggravated during service. Shedden v. Principi, 381 F.3d 1163, 1167 (Fed. Cir. 2004), citing Hansen v. Principi, 16 Vet. App. 110, 111 (2002); see also Caluza v. Brown, 7 Vet. App. 498 (1995). 

In this case, headaches is not listed among the "chronic diseases" under 38 C.F.R. § 3.309(a). However, cardiovascular disease and arthritis are listed among the "chronic diseases" under 38 C.F.R. § 3.309(a); therefore, 38 C.F.R. § 3.303(b) applies. Walker v. Shinseki, 708 F.3d 1331 (Fed. Cir. 2013). Where the evidence shows a "chronic disease" in service or "continuity of symptoms" after service, the disease shall be presumed to have been incurred in service. For the showing of "chronic" disease in service, there is required a combination of manifestations sufficient to identify the disease entity, and sufficient observation to establish chronicity at the time. With chronic disease as such in service, subsequent manifestations of the same chronic disease at any later date, however remote, are service-connected, unless clearly attributable to intercurrent causes. If a condition noted during service is not shown to be chronic, then generally, a showing of "continuity of symptoms" after service is required for service connection. 38 C.F.R. § 3.303(b). 

Additionally, where a veteran served ninety days or more of active service, and certain chronic diseases, such as cardiovascular disease or arthritis become manifest to a degree of 10 percent or more within one year after the date of separation from such service, such disease shall be presumed to have been incurred in service, even though there is no evidence of such disease during the period of service. 38 U.S.C.A. §§ 1101, 1112, 1113; 38 C.F.R. §§ 3.307, 3.309(a). While the disease need not be diagnosed within the presumption period, it must be shown, by acceptable lay or medical evidence, that there were characteristic manifestations of the disease to the required degree during that time. Id. 

Service connection may also be granted on a presumptive basis for a Persian Gulf Veteran who exhibits objective indications of qualifying chronic disability, including resulting from undiagnosed illness, that became manifest either during active service in the Southwest Asia theater of operations during the Persian Gulf War, or to a degree of 10 percent or more not later than December 21, 2016, and which by history, physical examination, and laboratory tests cannot be attributed to any known clinical diagnosis. 38 U.S.C.A. § 1117; 38 C.F.R. § 3.317(a)(1). In claims based on qualifying chronic disability, unlike those for "direct service connection," there is no requirement that there be competent evidence of a nexus between the claimed illness and service. Gutierrez v. Principi, 19 Vet. App. 1, 8-9 (2004). Notably, laypersons are competent to report objective signs of illness.

A "qualifying chronic disability" for VA purposes is a chronic disability resulting from (A) an undiagnosed illness, (B) a medically unexplained chronic multisymptom illness (such as chronic fatigue syndrome (CFS), fibromyalgia, or irritable bowel syndrome) that is defined by a cluster of signs or symptoms, or (C) any diagnosed illness that the Secretary determines in regulation prescribed under 38 U.S.C.A. § 1117(d) warrants a presumption of service connection. 38 U.S.C.A. § 1117(a)(2); 38 C.F.R. § 3.317(a)(2)(i)(B).

"Objective indications of chronic disability" include both "signs," in the medical sense of objective evidence perceptible to a physician, and other, non-medical indicators that are capable of independent verification. To fulfill the requirement of chronicity, the illness must have persisted for a period of six months. 38 C.F.R. § 3.317(a)(2), (3). Signs or symptoms that may be manifestations of undiagnosed illness include, but are not limited to, the following: (1) fatigue; (2) signs or symptoms involving skin; (3) headache; (4) muscle pain; (5) joint pain; (6) neurologic signs or symptoms; (7) neuropsychological signs or symptoms; (8) signs or symptoms involving the respiratory system (upper or lower); (9) sleep disturbances; (10) gastrointestinal signs or symptoms; (11) cardiovascular signs or symptoms; and (12) abnormal weight loss. 38 C.F.R. § 3.317(b).

Effective July 13, 2010, VA has amended its adjudication regulations governing presumptions for certain Persian Gulf War Veterans. Such revisions amend 38 C.F.R. § 3.317(a)(2)(i)(B) to clarify that CFS, fibromyalgia, and irritable bowel syndrome are examples of medically unexplained chronic multisymptom illnesses and are not an exclusive list of such illnesses. Additionally, the amendment removes 38 C.F.R. § 3.317(a)(2)(i)(B)(4) which reserves to the Secretary the authority to determine whether additional illnesses are "medically unexplained chronic multisymptom illnesses" as defined in subsection 38 C.F.R. § 3.317(a)(2)(ii) so that VA adjudicators will have the authority to determine on a case-by-case basis whether additional diseases meet the criteria of 38 C.F.R. § 3.317(a)(2)(ii). These amendments are applicable to claims pending before VA on October 17, 2010, as well as claims filed with or remanded to VA after that date. See 75 Fed. Reg. 61,997 (October 7, 2010).

Compensation under 38 U.S.C.A. § 1117 shall not be paid if there is affirmative evidence that: (1) an undiagnosed illness was not incurred during active military, naval, or air service in the Southwest Asia theater of operations during the Persian Gulf War; (2) an undiagnosed illness was caused by a supervening condition or event that occurred between the Veteran's most recent departure from active duty in the Southwest Asia theater of operations during the Persian Gulf War and the onset of the illness; or (3) the illness is the result of the Veteran's own willful misconduct or the abuse of alcohol or drugs. 38 C.F.R. § 3.317(c).

The term "Persian Gulf Veteran" means a veteran who served on active military, naval, or air service in the Southwest Asia theater of operations during the Persian Gulf War. 38 C.F.R. § 3.317(e)(1). The "Southwest Asia theater of operations" refers to Iraq, Kuwait, Saudi Arabia, Bahrain, Qatar, the United Arab Emirates, Oman, the Gulf of Aden, the Gulf of Oman, the Persian Gulf, the Arabian Sea, the Red Sea, and the airspace above these locations. 38 C.F.R. § 3.317(e)(2). 

With disability compensation claims, VA adjudicators are directed to assess both medical and lay evidence. As a general matter, a layperson is not capable of opining on matters requiring medical knowledge. See 38 C.F.R. § 3.159(a)(2). In certain circumstances, however, lay evidence may be sufficient to establish a medical diagnosis or nexus. See Davidson v. Shinseki, 581 F.3d 1313, 1316 (Fed. Cir. 2009). 

In addressing lay evidence and determining its probative value, if any, attention is directed to both competency ("a legal concept determining whether testimony may be heard and considered") and credibility ("a factual determination going to the probative value of the evidence to be made after the evidence has been admitted"). See Layno v. Brown, 6 Vet. App. 465, 469 (1994). In terms of competency, lay evidence has been found to be competent with regard to a disease with "unique and readily identifiable features" that is "capable of lay observation." See Barr v. Nicholson, 21 Vet. App. 303, 308-09 (2007) (concerning varicose veins); see also Jandreau v. Nicholson, 492 F.3d 1372, 1376-77 (Fed. Cir. 2007) (a dislocated shoulder); Charles v. Principi, 16 Vet. App. 370, 374 (2002) (tinnitus); Falzone v. Brown, 8 Vet. App. 398, 405 (1995) (flatfoot). That notwithstanding, a veteran is not competent to provide evidence as to more complex medical questions and, specifically, is not competent to provide an opinion as to etiology in such cases. See Woehlaert v. Nicholson, 21 Vet. App. 456, 462 (2007) (concerning rheumatic fever).

In weighing credibility, VA may consider interest, bias, inconsistent statements, bad character, internal inconsistency, facial plausibility, self-interest, consistency with other evidence of record, malingering, desire for monetary gain, and demeanor of the witness. See generally Caluza v. Brown, 7 Vet. App. 498 (1995). The Board may weigh the absence of contemporaneous medical evidence against the lay evidence in determining credibility, but the Board cannot determine that lay evidence lacks credibility merely because it is unaccompanied by contemporaneous medical evidence. See Buchanan v. Nicholson, 451 F.3d 1331, 1335 (Fed. Cir. 2006); but see Maxson v. Gober, 230 F.3d 1330 (Fed. Cir. 2000) (evidence of a prolonged period without medical complaint after service can be considered along with other factors in the analysis of a service connection claim). 

When there is an approximate balance of positive and negative evidence regarding any issue material to the determination of a matter, the Secretary shall give the benefit of the doubt to the claimant. 38 U.S.C.A. § 7105; 38 C.F.R. §§ 3.102, 4.3, 4.7. 

Analysis

Based upon a review of service records, the Board finds that the Veteran is a Persian Gulf Veteran. Service records document that the Veteran served in southwest Asia from August 1991 to November 1991. 

Service Connection for a Heart Disorder to include Atherosclerotic Heart Disease, Arteriosclerosis, Coronary Artery Disease, Heart Murmur and Heart Implant, to include as due to an Undiagnosed Illness. 

In May 2004, VA first received a claim from the Veteran for compensation for various disabilities to include heart implants. He specified that his heart disability began in October 1980 and that he was treated from October 1980 to May 2004 by Dr. "S.M." The RO denied service connection for heart implant in the September 2004 rating decision. In September 2005, the Veteran indicated that his claim should encompass a disability due to heart murmur and claimed entitlement to service connection for hypertension. 

In his November 2005 substantive appeal, he contended that service connection should be granted for his heart condition, alleging that he sought treatment for his heart during service, but the tests were reportedly inconclusive and he was treated for a murmur. 

The RO denied service connection for hypertension in January 2006. The Veteran did not initiate an appeal of that decision. In November 2008, he filed a claim stating his belief that medications provided him by the military, exposure to oil well fires, insects, and insecticides, caused a rapid deterioration of his health after separation from service. 

In January 2009 the RO sent him a letter asking him to provide specifics as to what he was contending such exposure and medication caused. He replied later that month as follows: "I feel I received clog arteries in the heart from months of exposure to smoke and elements from the burning oil wells during my tour in the middle east." 

The Court has held that when a claimant makes a claim, he is seeking service connection for symptoms regardless of how those symptoms are diagnosed or labeled. See Clemons v. Shinseki, 23 Vet. App. 1 (2009). Thus, in accordance with Clemons, the Board has recharacterized the issue of entitlement to a heart disorder to include heart murmur, heart implant, coronary artery disease and artherosclerotic heart disease. 

Based upon a review of all the lay and medical evidence, the Board finds the weight of the competent and credible evidence shows that the current heart disorders did not manifest in service or to a compensable degree within one year of service separation and is not otherwise related to active service. The Board finds the weight of the competent and credible evidence shows that the Veteran did not have chronic symptoms of a heart disorder in service or continuous symptoms after service and the heart disorder first manifested in 2004, almost 12 years after service separation. 

Service treatment records are absent for any evidence that the Veteran suffered symptoms of a heart disorder. Despite his report of seeking treatment for cardiac symptoms during service there is no evidence that he sought treatment or was treated for cardiac symptoms. A March 1979 enlistment examination report and a June 1983 periodic examination report indicates that examination of the heart was normal. The June 1983 examination report notes that the Veteran had a grade 2/6 murmur. An August 1989 chest x-ray revealed no significant abnormalities. An October 1990 service treatment record mentioned the heart, but the treatment was for complaints of cold symptoms, including a cough and heavy sputum. Physical examination revealed the Veteran's heart to have "Strong, relaxed rate Normal rhythm." He was assessed with a viral syndrome. These notes are not evidence that he had any heart disease during service. In April 1992 he reported wheezing in his chest and a sharp pain on the right side of the abdomen as well as sore ribs and congested chest. The clinician heard the wheezing with palpation of the chest with stethoscope. The diagnosis was bronchitis and the Veteran was prescribed Dimetapp, an inhaler, erythromycin, and robitussin. 

The service treatment records are therefore evidence against his claim as to service connection on a direct basis because the records tend to show that the Veteran did not have any symptoms, treatment, or diagnosis of a heart disorder in service. A heart murmur was detected in service, but, as will be discussed below, a heart murmur is not considered to be a disability for VA purposes. In short, the service treatment records are evidence against a grant of service connection for a heart disorder. 

The Veteran separated from service in July 1992. Post service medical records do not show evidence of a heart disorder prior to 2004. For example, a report, signed by "A.L.," M.D., includes a past medical history and review of symptoms showing no cardiorespiratory complaints. March 2001 treatment records from "T.M.," M.D. document that the Veteran had a regular heart rhythm and no murmurs. This is evidence that some nine years after service the Veteran did not have heart symptoms or a heart disorder. 

In a March 2004 letter Dr. S.M. explained that the Veteran was referred to him earlier that month following a recent abnormal stress test. That is the Veteran was first referred for a heart consultation more than a decade after separation. Dr. S.M. noted that the Veteran was found to have a soft systolic murmur over the precordium. Following diagnostic tests he was found to have a minimal sagging mitral valve and inferolateral ischemia. As a history, Dr. S.M. recorded that the Veteran had recently been experiencing some discomfort in his chest with occasional numbness and that a stress test done at Mesquite Community Hospital was normal. 

In March 2004, the Veteran underwent angioplasty and stent placement. Notes from May 2004 include a final diagnosis of arteriosclerotic heart disease status post PTCA (transluminal angioplasty) of LAD (left anterior descending artery), essential hypertension, hyperlipidemia, and chest pain with no evidence of myocardial infarction. 

The 2004 notes from Dr. S.M. are considered to be evidence against a finding that the Veteran had a heart disorder or murmur prior to 2004 because there is no mention in this report or in any of the treatment records that the Veteran reported having ever previously experienced cardiac symptoms or been told that he had a murmur. 

The Board finds that the weight of the competent and credible evidence establishes that the Veteran did not have chronic symptoms, diagnosis, or treatment of a heart disorder during active service; therefore, the criteria for presumptive service connection under 38 C.F.R. § 3.303(b) based on in-service chronic symptoms are not met. As noted, the service treatment records do not document treatment for chronic symptoms or diagnosis of a heart disorder. The Veteran asserts that he had a heart disorder in service, but he does not provide competent lay evidence or medical evidence of chronic symptoms in service or a diagnosis in service. The Veteran only asserts that he had a heart disorder in service. 

The Veteran is competent to state that he has observable symptoms such as chest pain. See Jandreau, 492 F.3d at 1376-77. However, the Board finds that the Veteran's statements that he had cardiovascular symptoms in service are not credible. The Veteran's statements concerning the cardiovascular symptoms are not supported by the service treatment records, the medical evidence of record, or by his own statements made during the course of his medical treatment. 

The service treatment records do not document any report of cardiovascular symptoms or establish a diagnosis of a heart disorder. These records were generated contemporaneously with the Veteran's service, and therefore are felt to have greater probative value than assertions made more than a decade after service and in conjunction with a claim for VA benefits. See Curry v. Brown, 7 Vet. App. 59, 68 (1994) (noting that contemporaneous evidence has greater probative value than history as reported by a veteran). Additionally, the post service treatment records show that the onset of the cardiovascular symptoms was in 2004, and this lengthy period without heart related complaints also weighs against the credibility of the Veteran's statements that his heart problems had existed since service. See Maxson v. Gober, 230 F.3d 1330, 1333 (Fed. Cir. 2000) (holding that a lengthy period without medical complaints about a condition can be considered as a factor in resolving a claim). 

While the Board is often prohibited from finding lay evidence not credible on the sole basis of a lack of contemporaneous records, silence in a record can sometimes be relied upon as contradictory evidence; specifically, the silence in record can be weighed against lay testimony if the alleged injury, disease, or related symptoms would ordinarily have been recorded in the medical record being evaluated by the fact finder. See Kahana v. Shinseki, 24 Vet. App. 428, 439 (2011) (Lance, J., concurring) (discussing credibility in relation to medical evidence); Fed. R. Evid. 803 (7) (the absence of an entry in a record may be evidence against the existence of a fact if such a fact would ordinarily be recorded). For this negative inference to be made, the Board must make two findings: first, that the record being evaluated is complete in relevant part; and, second, that the injury, disease, or related symptoms would ordinarily have been recorded had they occurred. The Board makes both findings in this case.
 
Here, in the context of seeking treatment for potential heart problems, the Board finds that it is not believable that the Veteran would fail to report a history of a heart disorder or heart murmur if such a history existed. There is no allegation that his records are incomplete, and as noted the Veteran did not report a history of heart problems when first seeking heart treatment post-service.
 
For the aforementioned reasons, the Board finds that the Veteran is not credible in his report that he had heart symptoms and/or a heart murmur during service. 

The Board further finds that the Veteran is not competent to render an opinion as to a medical diagnosis of a heart disorder he may have incurred in service. As noted, the Veteran, as a layperson, may report any observable symptoms he experienced having but without medical training, he does not have the expertise to diagnose a heart disorder or related any such disorder to service. The Veteran may relate a diagnosis that a doctor may have told him but he does not have the medical expertise to render a diagnosis himself. As to the specific issue in this case, an opinion as to the etiology and onset of a heart disorder and whether these disorders are related to a specific incident or event in service is a medically complex question that falls outside the realm of common knowledge of a lay person. See Jandreau; supra. See also Kahana v. Shinseki, 24 Vet. App. 428, 435 (2011). There is no indication that the Veteran has the requisite medical training and/or expertise needed to diagnosis a heart disability. 

The weight of the competent and credible evidence establishes that the heart disorder did not manifest to a compensable (10 percent) degree within a year of service separation. The Veteran separated from service in July 1992. There is no medical evidence or other competent evidence of record of record dated from a year from July 1992 which establishes a diagnosis of a heart disorder manifested to a degree of ten percent. As discussed, heart related symptoms were not treated for more than a decade after service, and the Veteran has not provided any competent or credible lay or medical evidence of the symptoms or diagnosis of a heart disorder within a year of separation. 

Finally, the Board finds that the weight of the evidence demonstrates that the current heart disorders are not caused by any in-service event or injury and are not medically related to service, to include Gulf War service. The Veteran was afforded a VA examination in April 2013. The VA examiner reviewed the claims folder, considered the Veteran's reported medical history, examined the Veteran, and offered an opinion as to the etiology of the claimed disorders. The diagnoses were hypertension, coronary artery disease and atherosclerotic heart disease. 

The VA examiner opined that it was less likely than not that any of these disorders were incurred in or caused by the claimed in-service injury, event, or illness. The examiner indicated that the medical opinion was based upon a review of the claims folder, medical records, and medical history, as well as his physical examination of the Veteran. The examiner noted that the service treatment records did not mention cardiac issues with the exception of the June 1983 examination which detected a grade 2/6 murmur. No other cardiac issues were noted. Any additional cardiac examination was not conducted. The examiner stated that review of the service treatment records did not show any specific cardiac pathology issues, and noted that an October 1990 service treatment record indicated normal cardiac findings. The examiner further noted that the Veteran did not recall specific cardiac issues prior to the 2003 and 2004 time frame and he expressed a concern that his service in the Gulf War may have somehow caused his cardiac problems on a delayed basis. As noted, the diagnoses included coronary artery disease and atherosclerosis. The examiner indicated that the Veteran did not have a myocardial infarction, congestive heart failure, cardiac arrhythmia, a heart valve condition, an infectious cardiac condition, or pericardial adhesions. 

The examiner opined that the it was less likely than not that the Veteran's heart problems began in service or were otherwise caused by his military service including his Gulf War service. The examiner stated that there was no significant evidence of cardiac pathology beginning or otherwise caused by military service. The examiner cited to the publication "Gulf War and Health: Volume 8, Health Effects of Serving in the Gulf War" (Gulf War Veterans' Illnesses, Institute of Medicine's Report on Gulf War and Health). The examiner indicated that this publication noted three conditions that have sufficient evidence of an association to the Gulf War service and these conditions were not cardiovascular disorders. The examiner further noted that chronic disability pattern associated with Southwest Asia environmental hazards have two distinct outcomes; one is referred to as an undiagnosed illness and the other is a diagnosed medically unexplained chronic multi symptom illness which includes chronic fatigue syndrome, fibromyalgia, and irritable bowel syndrome. The examiner stated that the Veteran did not exhibit a disability pattern that is consistent with this concept. There was no historical or documentary evidence of a disability pattern that was consistent with an undiagnosed illness. The examiner stated that the Veteran's symptomatology can be explained based upon standard medical definitions and practices. 

The examiner stated that the existence of a mild systolic murmur on one evaluation is not indicative of cardiac pathology especially, as is the case here, when there is normal function both at the time and subsequently up until 2003 and 2004. The examiner observed that the private cardiology records dated in November 2004, January 2005 and July 2005 made no mention of a murmur. 

The Board finds the April 2013 VA medical opinion to have great evidentiary weight as the opinion reflects a comprehensive and reasoned review of the entire evidentiary record. The VA examiner reviewed the claims folder and the Veteran's medical history and examined the Veteran before rendering the medical opinion. The examiner considered published medical research concerning Gulf War Veterans health concerns. Factors for assessing the probative value of a medical opinion are the examiner's access to the claims file and the thoroughness and detail of the opinion. See Hernandez-Toyens v. West, 11 Vet. App. 379, 382 (1998); see also Prejean v. West, 13 Vet. App. 444, 448-9 (2000). The medical opinion is based on sufficient facts and data. In Nieves-Rodriguez, 22 Vet. App. 295, the Court held that guiding factors in evaluating the probity of a medical opinion are whether the opinion was based on sufficient facts or data, whether the opinion was the product of reliable principles and methods, and whether the medical professional applied the principles and methods reliably to the facts of the case. 

The Veteran also underwent a VA examination in June 2009 with regard to his claim for service connection based on service in Southwest Asia during the Gulf War. The report indicates that heart problems were diagnosed in 2003 following ill defined chest pains. The Veteran reported that he had chest pains once per month at that time. Following physical examination, the examiner provided an impression, in pertinent part, of hypertensive vascular disease and hypertensive cardiovascular disease. The examiner stated that the Veteran's difficulty and problems with his heart are not related to Gulf War service. 

The April 2013 and June 2009 VA examination reports are competent and credible evidence that weighs against the Veteran's claims for service connection on either a presumed basis or on a direct basis. The VA medical professionals who conducted the Gulf War examinations specifically stated that the claimed heart disorders were not due to his Gulf War service. 

There no medical evidence in the claims file that establishes that the Veteran's claimed heart disorder is medically related to incident or event in service, including Gulf War service and any exposure to environmental toxins therein. 

The only evidence of record supporting the Veteran's assertions are his lay statements, which began as a statement that he believed his Gulf War service caused a deterioration of his health. As noted, the Veteran, as a lay person, is competent to describe observable symptoms such as pain. Although lay persons are competent to provide opinions on some medical issues, see Kahana, 24 Vet. App. at 435, as to the specific issue in this case, an opinion as to the etiology and onset of a heart disorder or disease falls outside the realm of common knowledge of a lay person. See Jandreau, 492 F.3d at 1377 n.4 (lay persons not competent to diagnose complex medical conditions such as cancer). Some medical issues require specialized training for a determination as to diagnosis and causation; therefore such issues are not susceptible of lay opinions on etiology. 

Lay testimony on the question of relating the current heart disorder to service is not competent in the present case because the Veteran is not competent, as a lay person, to state that these disabilities were caused by an specific incident or event in service. An opinion of etiology would require knowledge of the complexities of the cardiovascular system and the various causes of unobservable heart disease and would involve objective clinical testing that the Veteran is not competent to perform. The Veteran has not submitted evidence that he has such medical knowledge, expertise, or training, nor has he even alleged such. As to the Veteran's opinion that the clogged arteries is due to service, his opinion is not competent evidence. Causation of disease by factors such as insects, insecticides, medication, and smoke from oil fires is not something a lay person can observe with their five senses. Nor are these simple questions. Rather, it is public and common knowledge that research by medical professionals and scientists is regularly conducted to determine whether environmental conditions and pharmaceuticals cause disease and/or result in unintended or "side" effects. Therefore, the Veteran's opinion in this regard is assigned no probative value because it is not competent evidence. The weight of the evidence shows that the Veteran's heart disorder first manifested many years after service and is not medically related to incident or event in service including the Gulf War service. 

The weight of the evidence shows that the Veteran does not have a chronic qualifying disability or undiagnosed illness manifested by chest pain due to his Gulf War service. The symptoms of chest pain have been attributed to a known clinical diagnosis. There is no medical evidence of record indicating that the current heart disorder was caused by the Veteran's Gulf War service or other incident or event of active service. As discussed above the VA examination in April 2013 considered this theory and found no medical research to support it. Further, the VA examiner stated that there was no objective evidence of a chronic qualifying disorder manifested by chest pain. Because the Veteran's cardiovascular and heart symptoms have been assigned a diagnosis, those symptoms are not evidence of an undiagnosed illness or chronic multi symptoms disease and therefore service connection cannot be presumed for the Veteran's cardiovascular symptoms by application of 38 C.F.R. § 3.317. 

Regarding the claim for service connection for a heart murmur, the examiner who performed the April 2013 VA examination stated that the existence of a mild systolic ejection murmur on one evaluation is not indicative of cardiac pathology. As such, the heart murmur would not constitute a disability for VA compensation purposes. See, e.g. 38 C.F.R. § 4.104, Diagnostic Code 7015, NOTE (2012) (providing, in pertinent part, that with regard to atrioventricular block, simple delayed P-R conduction time, in the absence of other evidence of cardiac disease, is not a disability). 

Regarding the claim for service connection for a heart implant, the medical evidence of record does not establish that the Veteran underwent a heart implant. The medical evidence of record shows that the Veteran had a stent placed in his heart in 2004. As discussed in detail above, the heart disorder that led to the stent placement had its onset many years after active service and is not related to active service. 

For the reasons and bases discussed above, the Board finds that a preponderance of the lay and medical evidence that is of record weighs against the claim for service connection for a heart disorder to include a heart murmur, heart implant, coronary artery disease, and atherosclerosis including as a presumptive disease and on a direct basis, and the claim must be denied. Because the preponderance of the evidence is against the claim, the benefit of the doubt doctrine is not for application. See 38 U.S.C.A. § 5107; 38 C.F.R. § 3.102. 

Service Connection for Memory and Sleep Disorders

In November 2008, the Veteran filed a claim stating his belief that medications provided him by the military, exposure to oil well fires, insects, and insecticides, caused a rapid deterioration of his health after separation from service. In January 2009 the RO sent him a letter asking him to provide specifics as to what he was contending such exposure and medication caused. He replied later that month that he had "memory lost and problem sleeping." 

Service treatment records are absent for any evidence that the Veteran had suffered symptoms of memory loss or sleep problems. The service treatment records are therefore evidence against his claim as to service connection on a direct basis because the records tend to show that the Veteran did not have any symptoms of memory loss or sleep problems. Although the Veteran reports that he has had difficulty sleeping since service, there is no mention of sleep difficulties in his complete service records. Given that he reported other symptoms, it follows that if he had experienced sleep problems (or for that matter memory problems) during service he would have reported those also. In short, the service treatment records are evidence against a grant of service connection for sleep and memory problems. 

VA treatment notes document the Veteran's report of insomnia in April 2007. He reported that he tended to worry a lot, his brother was murdered in 2006, and the person had not been to trial. The assessment was depression not otherwise specified and bereavement. March 2007 treatment notes include the Veteran's report that he has not been able to sleep since he was in the military. Also of record are notes of alcoholism treatment provided at Summer Sky Incorporated in 2005. Alcohol dependency and post traumatic stress disorder were diagnosed and the Veteran did report some sleep problems. 

The Veteran underwent a VA psychiatric examination in June 2009. During the examination the Veteran reported that he felt depressed and stressed out at work and focused on his present occupation. Under a heading for mental status examination, the examiner noted the Veteran's report of decline in concentration and short term memory. The examiner commented that this is more likely than not related to his history of heavy alcohol abuse and that he had fair long term memory with gaps due to alcohol blackout spells. This VA opinion weighs against this claim, as it suggests a superseding cause of the memory problems. 

When asked about specific psychological symptoms, the Veteran reported initial and middle insomnia with varying frequency, as well as hypervigilance. He also reported some anger an irritability, but mainly in the context of his perceived harassment at work. The examiner diagnosed adjustment disorder with depressed mood and anxiety and alcohol abuse in full sustained remission. The examiner noted that the Veteran had claimed subjective memory loss and sleep disturbance secondary to exposure to burning oil fields in Kuwait but the examiner found that it was less likely than not that those claimed symptoms were related to the Veteran's military service. The examiner stated that he found it more likely than not that the symptoms related to the Veteran's history of adjustment disorder as well as residual problems secondary to a history of heavy drinking.

The Veteran was afforded another VA psychiatric examination in March 2013. The diagnoses were anxiety disorder not otherwise specified, depression, not otherwise specified, and alcohol abuse in full sustained remission. It was noted that the Veteran reported that he had been sober since completing a substance abuse program in 2005, that he had experienced trouble sleeping after his return from the Persian Gulf, and that he began to recognize the memory problems over the previous few years, including difficulty with his short term memory. The Veteran was noted to be taking medication for his insomnia at the time of the examination. The cognitive assessment showed some mild cognitive impairment. The examiner stated that the symptoms of chronic sleep impairment and mild memory loss were attributable to the diagnoses of anxiety disorder not otherwise specified and depression not otherwise specified. The examiner opined that the memory loss problems were less likely than not related to or caused by military service since the Veteran reported that the memory loss symptoms began a few years ago. The examiner also opined that the anxiety disorder and depression were less likely than not caused by or related to military service. The examiner opined that the anxiety and depression were more likely than not related to the Veteran's history of alcohol abuse, life stresses, and fears of not being able to take care of his family. 

The VA examination reports are evidence against the Veteran's claims for service connection for a disability manifested by memory loss and/or chronic sleep impairment. The weight of the competent and credible evidence establishes that these symptoms are attributed to the known clinical diagnoses of depression and anxiety disorder. The competent and credible evidence of record does not establish a separate or distinct disability manifested by memory loss or sleep impairment. 

Service connection for anxiety disorder is not established. The Veteran filed a claim for service connection for depression, and alcoholism, but the RO denied those claims in a December 2008 rating decision which the Veteran did not appeal and which is now final. Service connection has not been established for alcoholism, depression, anxiety disorder, or adjustment disorder, and therefore the Veteran's sleep problems and memory loss are part of a non-service connected condition rather than symptoms of a disease or injury with onset during or due to service. 

There no medical evidence in the claims file that establishes that the Veteran has a disability manifested by memory loss and/or sleep impairment other than the nonservice-connected depression, anxiety disorder, and adjustment disorder. The Veteran himself asserts that he believed his Gulf War service caused a deterioration of his health. As noted, the Veteran, as a lay person, is competent to describe observable symptoms. Although lay persons are competent to provide opinions on some medical issues, see Kahana, 24 Vet. App. at 435, as to the specific issue in this case, an opinion as to the diagnosis of a cognitive or psychiatric disorder falls outside the realm of common knowledge of a lay person. See Jandreau, 492 F.3d at 1377 n.4 (lay persons not competent to diagnose cancer). Some medical issues require specialized training for a determination as to diagnosis and causation; therefore such issues are not susceptible of lay opinions on etiology. Thus, the Veteran's opinion that he has a disability manifested by sleep problems and memory loss due to service is not competent evidence and is assigned no probative value because it is not competent evidence. 

The weight of the evidence shows that the Veteran does not have a qualifying chronic disability manifested by memory loss and/or sleep impairment due to his Gulf War service or active service. The symptoms of memory loss and sleep impairment have been attributed to a known clinical diagnosis and service connection is not in effect for that disorder. Therefore, service connection cannot be presumed for the Veteran's memory loss and sleep impairment symptoms by application of 38 C.F.R. § 3.317 and presumptive service connection pursuant to 38 C.F.R. § 3.317 is not warranted. 

For the reasons and bases discussed above, the Board finds that a preponderance of the lay and medical evidence that is of record weighs against the claim for service connection for a disability manifested by memory loss and/or sleep impairment including as a presumptive disease and on a direct basis, and the claim must be denied. Because the preponderance of the evidence is against the claim, the benefit of the doubt doctrine is not for application. See 38 U.S.C.A. § 5107; 38 C.F.R. § 3.102. 

Service Connection for a Right and Left Hip disability

In November 2008, the Veteran filed a claim stating his belief that medications provided him by the military, exposure to oil well fires, insects, and insecticides, caused a rapid deterioration of his health after separation from service. In January 2009 the RO sent him a letter asking him to provide specifics as to what he was contending such exposure and medication caused. He replied that he sustained months of exposure to smoke and elements from the burning oil wells during his tour in the middle east. He stated that "I feel it's a combination of being expose to the pills & shots, insects and insecticides, have cause bone deterioration in my hip." 

Based upon a review of all the lay and medical evidence, the Board finds the weight of the competent and credible evidence shows that the necrosis of the bilateral hips did not manifest in service or to a compensable degree within one year of service separation and is not otherwise related to active service. The Board finds the weight of the competent and credible evidence shows that the Veteran did not have chronic symptoms of a bilateral hip disorder in service or continuous symptoms after service but that the Veteran first began to have bilateral hips symptoms in 2009 and necrosis of the hips was diagnosed at that time. 

The medical evidence of record shows a diagnosis of avascular necrosis of the hips. Avascular necrosis has been defined as "morphological changes indicative of cell death and caused by...deficient blood supply. "Washington v. Nicholson, 19 Vet. App. 362, 364 (2005) (quoting Dorland's Illustrated Medical Dictionary 1101 (27th ed. 1988)). In the Veteran's case, the avascular necrosis is affecting the hip joints and causes joint pain. Arthritis has been defined as articular rheumatism or inflammation of a joint. Zevalkink v. Brown, 6 Vet. App. 483, 494 (1994). Degenerative joint disease or osteoarthritis is defined as "arthritis of middle age characterized by degenerative and sometimes hypertrophic changes in the bone and cartilage of one or more joints and a progressive wearing down of apposing joint surfaces with consequent distortion of joint position usually without bony stiffening." Giglio v. Derwinski, 2 Vet. App. 560, 561 (1992). The Board finds that affording the Veteran the benefit of the doubt, the avascular necrosis of the bilateral hips is analogous to arthritis of the hips and can be considered to be a chronic disease under 38 C.F.R. §§ 3.307, 3.309. 

Service treatment records are absent for any evidence that the Veteran suffered symptoms involving his hips. The service treatment records are therefore evidence against his claim as to service connection on a direct basis because the records tend to show that the Veteran did not have any symptoms of or treatment for hip problems. In short, the service treatment records are evidence against a grant of service connection for a bilateral hip disability. 

The earliest post service treatment records are from 1998. In March 1998 "M.W.," M.D. referred the Veteran for an x-ray of his lumbar spine and right hip pursuant to a history of right hip pain. Results were a normal lumbar spine and a negative right hip. Dr. M.W. referred him to a neurologist and an August 1998 report shows that the Veteran had reported a history of right groin pain of five months duration and tingling in his right lower extremity of two weeks duration. 

The report, signed by "A.L.," M.D. indicates that the Veteran complained of pain in the right groin and numbness in the right leg. Neurological examination revealed spasms in the right lumbar region. Dr. A.L. provided an assessment that the Veteran may have lumbar radiculopathy but electromyography (EMG) and nerve conduction studies were normal with no evidence of radiculopathy, myopathy, or neuropathy. An MRI study of the Veteran's lumbar spine was normal. September 1998 follow-up includes Dr. A.L.'s report that the Veteran no longer had symptoms of his right groin and leg. 

An abdominal x-ray series from February 1999 includes findings that there were changes in the femoral heads consistent with avascular necrosis. This is evidence that the Veteran does have a disorder of his hips but that the disorder is a diagnosed disease. This, therefore, is evidence against his claim for service connection based on a 38 C.F.R. § 3.317 presumption of service connection for an "undiagnosed" illness. 

An April 2008 bilateral hip x-ray study yielded an impression of irregular bone architecture of each femoral head. The radiologist indicated that this was compatible with previous diagnosis of early avascular necrosis. September 2008 VA treatment notes includes the Veteran's report of hip pain which he described as stiffness. A rheumatology consult report addressed his report of achiness of his shoulders and wrists. Musculoskeletal physical examination revealed mild loss of internal rotation of the hips. Radiology studies included the same report from April 2008. Rheumatology clinic notes from January 2009 include a diagnosis of osteonecrosis of the hips. 

Again, because the Veteran's symptoms involving his hips have been assigned a diagnosis, those symptoms are not evidence of an undiagnosed illness and therefore service connection cannot be presumed for his bilateral hip condition by application of 38 C.F.R. § 3.317. 

The Veteran underwent a VA examination of his hips in June 2009. The examiner indicated that he had reviewed the Veteran's claims file. He diagnosed aseptic necrosis of the hips with onset in 2006 and provided an opinion that the condition was not secondary to his Gulf War service. This is evidence that weighs against this claim. 

The Veteran was afforded another VA examination of the hips in April 2013. The diagnosis was bilateral hip avascular necrosis. The examination report indicates that the Veteran reported that he first began to have problems with the hip pain in approximately 2009; he noted some pain in the anterior aspect of both hips and some minor pain to the lateral hips. He reported no injuries or trauma. The Veteran stated that he did not recall having any prior hip problems or injuries. In a June 2013 VA opinion, the VA examiner indicated that he reviewed the Veteran's claims folder and medical records. The VA examiner concluded that it was less likely than not that the claimed hip disability to include bilateral avascular necrosis demonstrated a nexus to an undiagnosed illness. The VA examiner opined that the etiology of the bilateral hip avascular necrosis was at least as likely as not due to the Veteran's past history of alcohol abuse. The VA examiner stated that this conclusion was based upon a comprehensive review of the clinical files, VA records, and current medical literature. The VA examiner stated that the reasons of the medical conclusion are as follows: there was no diagnosis, treatment or event pertaining to the hips while the Veteran was in service or during the presumptive period after service; there was no medical record of a traumatic event affecting the right and left hips to account for the bilateral avascular necrosis; the April 2008 x-ray examination report showed early changes of the hip joints and noted that there was no evidence of fractures or dislocations; and the Veteran had a diagnosis of alcohol abuse as noted by the March 2013 VA examination. The VA examiner cited to medical research that "Alcohol abuse is predisposing condition associated with osteonecrosis" and cited to Kumar: Robbins and Cotran Pathologic Basis of Disease, Professional Edition, 8th ed. The VA examiner noted that the femoral head was the most common site for alcohol induced osteonecrosis. He indicated that "The pathphysiology of an alcohol induced osteonecrosis is explained as "excessive alcohol intake has been a etiologically linked with osteonecrosis. One large study showed an incidence of 5.3 percent in 1157 medically treated alcoholics. Alcohol induces a hyperlipidemic state which can lead to accumulation of lipids in osteocytes. This resulted in experimental bone necrosis. It has also been shown that fat laden microemboli are formed in patients with high alcohol intake." The VA examiner cited to Meenagh, G.K., Wright, G.D., Debilitating knee pain in a patient with "normal" radiographs, Ann Rheum Dis 2001; 60; 650-652, doi:10.1136/ard.60.7.650). The VA examiner further noted that presently, the Gulf War Veteran Undiagnosed Illness presumptive service connection list of medically unexplained condition does not include bony changes secondary to an avascular necrotic process of the hip joints. 

The Board finds the above-cited VA medical opinion to be highly probative evidence, because the examiner relied on sufficient facts and data and provided a rationale for the respective opinion. Nieves-Rodriguez; supra. The VA examiner reported the detailed examination findings and medical research which supported his medical conclusion. 

Based upon a review of all the lay and medical evidence, the Board finds the weight of the competent and credible evidence shows that the necrosis of the bilateral hips did not manifest in service or to a compensable degree within one year of service separation and is not otherwise related to active service. The Board finds the weight of the competent and credible evidence shows that the Veteran did not have chronic symptoms of a bilateral hip disorder in service or continuous symptoms after service. The weight of the competent and credible evidence establishes that the Veteran first began to have bilateral hips symptoms in 2009 and necrosis of the hips was diagnosed at that time. Finally, the Board finds that the weight of the evidence demonstrates that the bilateral hip disability is not caused by any in-service event or injury and is not medically related to service, to include Gulf War service. 

There is no medical evidence in the claims file that establishes that his claimed bilateral hip disability first manifested during service or was directly caused by his service including Gulf War service. There is only the Veteran's assertions, which began as a statement that he believed his Gulf War service caused a deterioration of his health. As noted, the Veteran, as a lay person, is competent to describe observable symptoms such as pain. Although lay persons are competent to provide opinions on some medical issues, see Kahana, 24 Vet. App. at 435, as to the specific issue in this case, an opinion as to the etiology and onset of avascular necrosis falls outside the realm of common knowledge of a lay person. See Jandreau, 492 F.3d at 1377 n.4. Some medical issues require specialized training for a determination as to diagnosis and causation; therefore such issues are not susceptible of lay opinions on etiology. An opinion of etiology would require knowledge of the complexities of the musculoskeletal system and the various causes of avascular necrosis and would involve objective clinical testing such as x-ray examination that the Veteran is not competent to perform. The Veteran has not submitted evidence that he has such medical knowledge, expertise, or training. Therefore, the Veteran's opinion in this regard is assigned no probative value because it is not competent evidence. 

There is no medical evidence of record indicating that the current avascular necrosis of the hips was caused by the Veteran's Gulf War service or other incident or event of active service. As discussed above the VA examination in April 2013 and the June 2013 VA medical opinion considered this theory and found no medical research to support it. Because the Veteran's bilateral hip disability has been assigned a diagnosis, those symptoms are not evidence of an undiagnosed illness or chronic multi symptoms disease and therefore service connection cannot be presumed under 38 C.F.R. § 3.317. Therefore, presumptive service connection pursuant to 38 C.F.R. § 3.317 is not warranted. 

For the reasons and bases discussed above, the Board finds that a preponderance of the lay and medical evidence that is of record weighs against the claim for service connection for a bilateral hip disability to include avascular necrosis, including as a presumptive disease and on a direct basis, and the claim must be denied. Because the preponderance of the evidence is against the claim, the benefit of the doubt doctrine is not for application. See 38 U.S.C.A. § 5107; 38 C.F.R. § 3.102. 

Service Connection for Headaches

In November 2008, the Veteran filed a claim stating his belief that medications provided him by the military, exposure to oil well fires, insects, and insecticides, caused a rapid deterioration of his health after separation from service. In January 2009, the RO sent him a letter asking him to provide specifics as to what he was contending such exposure and medication caused. He replied later that month that he had headaches and stated that he had months of exposure to smoke and elements from the burning oil wells during his tour in the middle east. 

The Board finds the weight of the competent and credible evidence shows that the Veteran did not have chronic symptoms of headaches in service or continuous symptoms after service. Service treatment records are absent for any evidence that the Veteran had chronic headaches in service. An August 1987 service treatment record notes that the Veteran reported that his sinuses get clogged up and he gets migraines every once in a while. Assessment was to rule out common cold. In March 1988 he complained of a sore body, swollen lymph glands, swollen gums, a headache, and clogged sinuses of one day duration. He was assessed with an upper respiratory infection. In May 1988 he complained of chills, dizziness, and headaches. He was sent to the emergency room where he was found to have a smoker's type of red throat and diagnosed with some type of illness (illegible record in this regard). A day later he was diagnosed as having a local reaction to a tetanus toxoid. 

Thus, while headaches are mentioned in the service treatment records, there is no mention of a chronic headache disorder being diagnosed, and headaches that the Veteran did specifically report were attributed to other illnesses, including a common cold and an upper respiratory infection. Moreover, there is no further in-service mention of headaches after May 1988, tending to show that any headache disability was acute and transitory episode. 

The earliest documentation of headaches in the post service treatment records is in September 2004, when the Veteran complained to Dr. S.M. about ear pain that had been going on for the previous week as well as headaches and nosebleeds. The diagnosis was bilateral otitis media. Although notes from this practitioner as far back as 2003 document numerous other reported symptoms, there is no other mention of headaches. This tends to show that even in 2003 he did not have chronic headaches but only acute and transitory symptoms. 

In June 2009, the Veteran underwent a VA examination with regard to his claim for service connection based on service in Southwest Asia during the Gulf War. He reported a history of headaches in the temporal areas of his head, which he reported he had two or three times per week and lasted 10 to 15 minutes. He reported that the headaches were always of about the same severity and frequency. Following physical examination, the examiner provided an impression of tension headaches. The examiner opined that the Veteran's headaches were not related to Gulf War service. 

The Board finds that the weight of the evidence demonstrates that a headaches disorder is not caused by any in-service event or injury and is not medically related to service, to include Gulf War service. The Veteran was afforded a second VA examination in April 2013. The VA examiner reviewed the claims folder, considered the Veteran's reported medical history, examined the Veteran, and offered an opinion as to the etiology of the claimed disorder. The VA examiner reviewed the service treatment records, noting the Veteran's complaints of headaches on limited occasions. The VA examiner also noted that the Veteran denied having received any prolonged treatment for his headaches by his private physician subsequent to military service. The examiner observed that there was no mention of chronic headaches through 2003, and noted that a VA treatment record dated in December 2008 mentions headaches in the review of systems and the July 2009 VA examination report reported a diagnosis of tension headaches. 

The Veteran reported that he has had almost daily headaches, lasting five to 20 minutes, located in the bitemporal region not associated with any aura or other neurological changes, for which he took Aleve and Advil as needed. He did not recall any recent evaluation or other treatment by his treating providers. 

The diagnosis was tension headaches. The examiner opined that it was less likely than not that the Veteran's tension headaches began in service or were otherwise caused by his military service including his Gulf War service. The examiner cited to the publication "Gulf War and Health: Volume 8, Health Effects of Serving in the Gulf War" (Gulf War Veterans' Illnesses, Institute of Medicine's Report on Gulf War and Health). The examiner indicated that this publication noted three conditions that have a sufficient evidence of an association to the Gulf war service; a headaches disorder was not one of these conditions. The examiner further noted that chronic disability pattern associated with southwest Asia environmental hazards have two distinct outcomes. One is referred to as an undiagnosed illness and the other is a diagnosed medically unexplained chronic multi symptom illness which includes chronic fatigue syndrome, fibromyalgia, and irritable bowel syndrome. The examiner stated that the Veteran did not exhibit a disability pattern that is consistent with this concept. There was no historical or documentary evidence of a disability pattern that was consistent with an undiagnosed illness. The examiner stated that the Veteran's symptomatology can be explained based upon standard medical definitions and practices. As noted above, the diagnosis was tension headaches. The examiner further opined that it was less likely than not that the Veteran's headaches disorder (tension headaches) either began during service or was otherwise caused by his military service including Gulf War service. The examiner stated that the time pattern and documentation of events during and following military service do not support a causal etiologic nexus between the headaches and military service based on currently available information. 

The Board finds the above-cited VA medical opinion to be highly probative evidence, because the examiner relied on sufficient facts and data and provided a rationale for the respective opinion. Nieves-Rodriguez; supra. The VA examiner reported the detailed examination findings and medical research which supported his medical conclusion. 

There no medical evidence in the claims file that establishes that his claimed tension headaches disorder first manifested during service or was directly caused by his service including his Gulf War service. There is only the Veteran's assertions, which began as a statement that he believed his Gulf War service caused a deterioration of his health. As noted, the Veteran, as a lay person, is competent to describe observable symptoms such as headache pain. Although lay persons are competent to provide opinions on some medical issues, see Kahana, 24 Vet. App. at 435, as to the specific issue in this case, an opinion as to the etiology and onset of a headaches disorder falls outside the realm of common knowledge of a lay person. An opinion of etiology of a headaches disorder including whether exposure to oil fires or other toxins caused the current headaches disorder requires complex medical and scientific knowledge which the Veteran does not possess. Therefore, the Veteran's opinion in this regard is assigned no probative value because it is not competent evidence. Also, as noted above, the VA examiner who conducted the April 2013 VA examination indicated that he had reviewed medical research concerning veterans and Gulf War illnesses, and he did not find any medical research establishing that tension headaches is a disease that is causally related to Gulf War service. 

There is no medical evidence of record indicating that the current tension headaches was caused by the Veteran's Gulf War service or other incident or event of active service. As discussed above the VA examiner who performed the VA examination in April 2013 considered this theory and found no medical research to support it. Because the Veteran's tension headaches has been assigned a diagnosis, those symptoms are not evidence of an undiagnosed illness or chronic multi symptoms disease and therefore service connection cannot be presumed under 38 C.F.R. § 3.317. Therefore, presumptive service connection pursuant to 38 C.F.R. § 3.317 is not warranted. 

For the reasons and bases discussed above, the Board finds that a preponderance of the lay and medical evidence that is of record weighs against the claim for service connection for tension headaches including as a presumptive disease and on a direct basis, and the claim must be denied. Because the preponderance of the evidence is against the claim, the benefit of the doubt doctrine is not for application. See 38 U.S.C.A. § 5107; 38 C.F.R. § 3.102. 

3. Entitlement to a Higher Initial Rating

Legal Criteria

Disability ratings are determined by applying the criteria set forth in the VA Schedule for Rating Disabilities (Rating Schedule) found in 38 C.F.R. Part 4. 38 U.S.C.A. § 1155. It is not expected that all cases will show all the findings specified; however, findings sufficiently characteristic to identify the disease and the disability therefrom and coordination of rating with impairment of function will be expected in all instances. 38 C.F.R. § 4.21. 

Where there is a question as to which of two evaluations (ratings) shall be applied, the higher rating will be assigned if the disability picture more nearly approximates the criteria for that rating. Otherwise, the lower rating will be assigned. 38 C.F.R. § 4.7. When there is an approximate balance of positive and negative evidence regarding the merits of an issue material to the determination of the matter, the benefit of the doubt in resolving each such issue shall be given to the claimant. 38 U.S.C.A. § 5107(b); 38 C.F.R. §§ 4.3, 4.7. 

Where entitlement to compensation has already been established and an increase in the disability rating is at issue, the present level of disability that is of primary concern. See Francisco v. Brown, 7 Vet. App. 55, 58 (1994). 

In Fenderson v. West, 12 Vet. App. 119 (1999), the Court held that evidence to be considered in the appeal of an initial assignment of a disability rating was not limited to that reflecting the then current severity of the disorder. Cf. Francisco v. Brown, 7 Vet. App. 55, 58 (1994). 

In Fenderson, the Court also discussed the concept of the "staging" of ratings, finding that, in cases where an initially assigned disability evaluation has been disagreed with, it was possible for a veteran to be awarded separate percentage evaluations for separate periods based on the facts found during the appeal period. Id. at 126-127. See also Hart v. Mansfield, 21 Vet. App. 505 (2007) (where the evidence contains factual findings that show a change in the severity of symptoms during the course of the rating period on appeal, assignment of staged ratings would be permissible). 

In determining the severity of a disability, the Board is required to consider the potential application of various other provisions of the regulations governing VA benefits, whether or not they were raised by the Veteran, as well as the entire history of the Veteran's disability. 38 C.F.R. §§ 4.1, 4.2; Schafrath v. Derwinski, 1 Vet. App. 589, 595 (1991).

When a disability not specifically provided for in the rating schedule is encountered, it will be rated under a closely related disease or injury in which not only the functions affected, but the anatomical localization and symptomatology are closely analogous. Conjectural analogies will be avoided, as will the use of analogous ratings for conditions of doubtful diagnosis, or for those not fully supported by clinical and laboratory findings. 38 C.F.R. § 4.20. The assignment of a particular Diagnostic Code is "completely dependent on the facts of a particular case." Butts v. Brown, 5 Vet. App. 532, 538 (1993). One Diagnostic Code may be more appropriate than another based on such factors as an individual's relevant medical history, the current diagnosis and demonstrated symptomatology. 

Under Diagnostic Code 7304, gastric ulcer, a mild gastric ulcer with recurring symptoms once or twice yearly warrants a 10 percent rating. A moderate gastric ulcer with recurring episodes of severe symptoms two or three times a year averaging 10 days in duration or with continuous moderate manifestations warrants a 20 percent rating. A 40 percent rating will be assigned where there is evidence of a moderately severe gastric ulcer; less than severe but with impairment of health manifested by anemia and weight loss; or recurrent incapacitating episodes averaging 10 days or more in duration at least four or more times a year. A 60 percent rating is warranted where there is evidence of a severe gastric ulcer; pain only partially relieved by standard ulcer therapy, periodic vomiting, recurrent hematemesis, or melena, with manifestations of anemia and weight loss productive of definite impairment of health. 38 C.F.R. § 4.114, Diagnostic Code 7304. 

Under Diagnostic Code 7307, a 10 percent evaluation is warranted when there is chronic gastritis with small nodular lesions, and symptoms. A 30 percent evaluation is warranted when there is chronic gastritis with multiple small eroded or ulcerated areas, and symptoms. A 60 percent rating is assigned for gastritis with severe hemorrhages or, large ulcerated or eroded areas. 38 C.F.R. § 4.114, Diagnostic Code 7304.

Weight loss is a consideration in evaluating digestive system disorders. VA regulations provide that, for purposes of evaluating conditions in 38 C.F.R. § 4.114, the term "substantial weight loss" means a loss of greater than 20 percent of the individual's baseline weight, sustained for three months or longer; and the term "minor weight loss" means a weight loss of 10 to 20 percent of the individual's baseline weight, sustained for three months or longer. The term "inability to gain weight" means that there has been substantial weight loss with inability to regain it despite appropriate therapy. "Baseline weight" means the average weight for the two-year-period preceding onset of the disease. 38 C.F.R. § 4.112. 

Ratings under Diagnostic Codes 7301 to 7329, inclusive, 7331, 7342, and 7345 to 7348, inclusive, will not be combined with each other. A single disability rating will be assigned under the diagnostic code which reflects the predominant disability picture, with rating to the next higher evaluation where the severity of the overall disability warrants such rating. See 38 C.F.R. § 4.114.

Analysis: Gastritis

The RO listed the Diagnostic Code for its assignment of a 10 percent rating for erosive gastritis as 7307-7304. In rating disability due to diseases, the preference is to be given to the disease itself; if the rating is determined on the basis of residual conditions, the number appropriate to the residual condition will be added, preceded by a hyphen. Thus, the RO has rated the disease gastritis (38 C.F.R. § 4.114 Diagnostic Code 7307) on the basis of the residual condition, gastric ulcer (38 C.F.R. § 4.114 Diagnostic Code 7304). 

The assignment of a particular diagnostic code is "completely dependent on the facts of a particular case." See Butts v. Brown, 5 Vet. App. 532, 538 (1993). One diagnostic code may be more appropriate than another based on such factors as an individual's relevant medical history, and the diagnosis and demonstrated symptomatology. Any change in a diagnostic code by a VA adjudicator must be specifically explained. See Pernorio v. Derwinski, 2 Vet. App. 625, 629 (1992).

The Board has carefully reviewed the evidence of record and finds that the disability picture for the service-connected gastritis more nearly approximates the criteria required for a 20 percent rating under Diagnostic Code 7304 for the entire appeal period. Under Diagnostic Code 7304, a 20 percent rating is warranted for moderate impairment due to a gastric ulcer with recurring episodes of severe symptoms two or three times a year averaging 10 days in duration or with continuous moderate manifestations. 38 C.F.R. § 4.114. 

The weight of the competent and credible evidence establishes that the service-connected gastritis disability picture more closely approximates continuous moderate manifestations, than recurring mild symptoms. The medical evidence shows that the gastritis has been characterized as mild but not severe. A July 2004 VA treatment record notes a diagnosis of mild reflux esophagitis. An August 2004 VA examination report indicates that testing showed that the Veteran had mild erosive gastritis. A September 2005 upper gastrointestinal series indicates that the Veteran had mild erosive gastritis. A March 2006 VA examination report shows a diagnosis of erosive gastritis and mild ulceration, no residuals or bleeding. The April 2013 VA examination report indicates that the examiner, having reviewed the entirety of the medical record and examined the Veteran, stated that the Veteran's symptoms were recurring but not severe. 

The Board finds that for the entire appeal period, the service-connected disability is manifested by continuous symptoms as well as by periodic episodes of increased symptomatology. The competent and credible evidence shows that the Veteran takes medication daily to control the symptoms of his service-connected disability, and during the appeal period, the frequency of his symptoms ranged from daily to two times a week to two or three times a month. However, at no time was the Veteran found to have incapacitating episodes averaging 10 days or more at a time; and the Veteran himself has not alleged such incapacitation.

A November 2004 VA treatment record indicates that the Veteran reported having abdominal pain; he had a palpable distended stomach on examination and he took omeprazole every day. A March 2006 VA examination report indicates that the Veteran reported having occasional abdominal pain. It was noted that he took protonix everyday and he had been on this medication for two years. VA treatment records dated from 2006 to 2008 show that the Veteran continued to have symptoms of abdominal pain and he continued to take medications for his stomach symptoms. See the VA treatment records dated in May 2006, March 2007, September 2007, and February 2008. A September 2007 VA treatment record indicates that the Veteran reported having constant pain in the right side of his abdomen which was sometimes sharp. The assessment was abdominal pain. A February 2008 VA treatment record indicates that the Veteran reported having abdominal pain on a daily basis. At a September 2008 VA examination, the Veteran reported that he often had to go to bed two days a month because of his abdominal problems , which triggered the need to go to his doctor and caused him to miss work. He reported that he had abdominal pain in the right side and he had the pain two or three times a month. He reported having occasional intermittent cramps versus an ache in the mid abdomen. 

The Veteran was afforded a VA examination in April 2013. The diagnosis was duodenal ulcer, esophageal ulcer with upper gastrointestinal hemorrhage, and erosive gastritis. The Veteran reported having recent symptoms of epigastric pain two times a week with cramping with no blood in stool, melena, or vomiting. He took antacids which help for awhile and he was also prescribed pantoprozole. The examiner stated that the Veteran had recurring episodes of symptoms that were not severe. He had 4 or more episodes of the symptoms per year, but the duration of the episodes was less than one day. The Veteran reported having abdominal pain that occurred at least monthly. He had nausea 4 or more times a year and the duration of the nausea was less than one day. The severity of the nausea was described as recurrent. It was noted that the Veteran had incapacitating episodes due to the stomach condition. He reported having 4 or more episodes a year and the episodes lasted less than one day. He reported having epigastric pain and nausea. He took antacids and reported that he missed work 3 or 4 times a month. 

The Board finds that for the entire appeal period, the service-connected disability more closely approximates the criteria for the 20 percent rating under Diagnostic Code 7304 based upon the evidence of continuous moderate manifestations. The competent and credible evidence establishes that the Veteran has more frequent symptoms that occur more than once or twice a year. The record further shows that the Veteran takes medication daily for his abdominal symptoms. Based upon this evidence, the Board finds that the disability picture more closely approximates the criteria for the 20 percent rating under Diagnostic Code 7304. 

The Board finds that the preponderance of the evidence is against the assignment of a 40 percent rating or higher under Diagnostic Code 7304. The Board finds that the service-connected disability does not more closely approximate the criteria for a 40 percent rating under Diagnostic Code 7304. The medical evidence does not demonstrate impairment of health manifested by anemia and weight loss. The VA examination reports dated in 2004, 2006, 2008, and 2013 indicate that the Veteran did not have anemia and his weight was stable. There is no evidence of impairment of health manifested by weight loss. There is no evidence of incapacitating episodes averaging 10 days in duration or more in duration and occurring four or more times a year. By the Veteran's report, his episodes lasted from one to three days. See the April 2013 VA examination report. 

The record also does not show that the criteria for a 60 percent rating have been met. The Veteran's service-connected disability is not manifested by a severe gastric ulcer, periodic vomiting, recurrent hematemesis, or melena, with manifestations of anemia and weight loss productive of definite impairment of health. The medical evidence shows that the Veteran's gastric ulcer is healed. The VA examination reports and treatment records show that the Veteran denied having periodic vomiting, recurrent hematemesis, or melena. The VA examiner noted in April 2013 that the Veteran's symptoms were not severe. In fact, the examiner opined that from the evidence of record, he did not find evidence that the Veteran had an active gastric ulcer during the course of his appeal. The examiner noted that the Veteran did have mild erosive gastritis on two occasions, but it did not produce any hemorrhages, and had subsequently healed. To the extent the Veteran did have a hemorrhage, it was attributable to an esophageal ulcer with spurting vessel, and not from his service connected gastritis.
 
The weight of the competent and credible evidence shows that the gastrointestinal bleeding the Veteran had in 2004 was not caused by his service-connected gastritis but was due to a nonservice-connected esophageal ulcer. Of record are treatment notes from "F.S.," M.D. The May 2004 treatment notes document that the Veteran was admitted with hematemesis and significant upper gastrointestinal bleeding. He underwent a esophagogastroduodenoscopy (EGD) including cauterization of an esophageal ulcer. A July 2004 EGD procedure report documents that the Veteran underwent another EGD due to history of esophageal ulcer. The impression was healed esophageal ulcer, small hiatal hernia, and no gastric or duodenal ulcers. A follow up in August 2004 includes an entry that he had a healed esophageal ulcer. 

In August 2004 he underwent a VA examination with regard to his gastric condition. The examiner indicated that the RO had not provided the claims file or service records for review but the relevant history provided by the Veteran during the examination is not significantly different from what is found in the claims file. The Veteran reported that he underwent a surgical procedure in 1997 to cauterize gastric bleeding. The examiner noted that the Veteran was not currently anemic. During the examination the Veteran reported that he had lost 4 months of work due to gastrointestinal bleeding in the past year. During this examination examiner stated that in May and July of 2004 the Veteran had gastric bleeding episodes and he stated that the bleeding was more likely than not from an upper gastrointestinal source as opposed to an ano-rectal source. The examiner provided an impression of upper gastrointestinal ulceration with bleeding and speculated that this was likely related to enterogastritis with ulceration. He also stated that the Veteran had erosive gastritis as shown on an upper gastrointestinal series. An attached report includes an impression of mild erosive gastritis. A July 2009 UGI shows a healed duodenal bulb, chronic changes related to previous duodenal ulcer, no esophageal abnormality, and a normal stomach. The VA examiner who performed the April 2013 VA examination reviewed the Veteran's medical records and indicated that the hemorrhage in 2004 was from an esophageal ulcer with a spurting vessel and was not from a gastric or duodenal ulcer. For these reasons, an initial rating of 20 percent and no higher is warranted under Diagnostic Code 7304 for the entire appeal period. 

The Board finds that the preponderance of the evidence is against the assignment of a disability rating in excess of 20 percent under Diagnostic Code 7307 for the entire appeal period. As discussed above, the service-connected gastritis is manifested by continuous manifestations, primarily abdominal pain, and recurring episodes. The medical evidence including the diagnostic tests show that the service-connected gastritis is healed and does not produce hemorrhage and the more recent testing showed healed gastric and duodenal mucosa. In February 2008 an upper gastrointestinal study was conducted. The impression was normal upper gastrointestinal series. The Veteran underwent a CT of the abdomen in March 2008 following complaints of abdominal pain of the right upper quadrant. The impression did not include any statement regarding his digestive system. An upper gastrointestinal series, from July 2009, includes findings that no active ulcer was identified. The impression was chronic changes related to previous peptic ulcer disease involving the duodenal bulb. See also the April 2013 VA examination report. The examiner opined that from a review of the evidence, chronic gastritis was not shown during the course of the Veteran's appeal, and therefore there was no evidence of multiple small or large eroded or ulcerated areas or severe hemorrhages. Additionally, any hemorrhage was found to be attributable to a non-service connected esophageal ulcer, and not to the service connected gastric ulcer. Thus, a schedular rating in excess of 20 percent under Diagnostic Code 7307 is not warranted at any time during the appeal period. 

In conclusion, the Board finds that the assignment of an initial 20 percent rating, but no more for the service-connected gastritis is warranted for the entire appeal period. The claim is granted to that extent. 

Extraschedular Consideration

The Board has also considered whether referral for consideration of an extraschedular rating is warranted, noting that if an exceptional case arises where ratings based on the statutory schedules are found to be inadequate, consideration of an "extra-schedular" evaluation commensurate with the average earning capacity impairment due exclusively to the service-connected disability or disabilities will be made. 38 C.F.R. § 3.321(b)(1). The Court has held that the determination of whether a claimant is entitled to an extraschedular rating under § 3.321(b) is a three-step inquiry, the responsibility for which may be shared among the RO, the Board, and the Under Secretary for Benefits or the Director, Compensation and Pension Service. Thun v. Peake, 22 Vet. App. 111 (2008). The threshold factor for extraschedular consideration is a finding that the evidence before VA presents such an exceptional disability picture that the available schedular evaluations for that service-connected disability are inadequate. This means that initially there must be a comparison between the level of severity and symptomatology of the claimant's service-connected disability with the established criteria found in the rating schedule for that disability. If the criteria reasonably describe the claimant's disability level and symptomatology, then the claimant's disability picture is contemplated by the rating schedule, the assigned schedular evaluation is adequate, and no referral is required. If the criteria do not reasonably describe the claimant's disability level and symptomatology, a determination must be made whether the claimant's exceptional disability picture exhibits other related factors such as those provided by the regulation as "governing norms." 38 C.F.R. § 3.321(b)(1) (related factors include "marked interference with employment" and "frequent periods of hospitalization"). See id. 

In this case, the Board finds that the schedular rating criterion reasonably contemplates the symptoms and impairment caused by the Veteran's service-connected gastritis, and the assigned schedular evaluations, therefore, are adequate. The rating criteria reasonably describe his disability level and symptomatology, and provide for higher ratings for additional or more severe symptoms than currently shown by the evidence. The schedular rating criteria contemplates whether symptoms are recurrent and whether they cause impairment in health. The symptoms are considered based on frequency of recurrence, incapacitation, and impairment of health. Because the schedular rating criteria are adequate to rate the disability, there is no exceptional or unusual disability picture to render impractical the application of the regular schedular standards. Accordingly, referral for extra-schedular consideration for the claim on appeal is not required. 







ORDER

Service connection for a heart disorder to include heart implant, heart murmur, arteriosclerotic heart disease, and coronary artery disease, to include as due to an undiagnosed illness, is denied. 

Service connection for memory loss and sleep problems, to include as due to an undiagnosed illness, is denied. 

Service connection for a bilateral hip disability to include avascular necrosis, to include as due to an undiagnosed illness, is denied. 

Service connection for headaches, to include as due to an undiagnosed illness, is denied. 

A 20 percent initial disability rating for gastritis is granted, subject to the laws and regulations governing the award of monetary benefits. 


____________________________________________
MATTHEW W. BLACKWELDER
Acting Veterans Law Judge, Board of Veterans' Appeals

Department of Veterans Affairs